### SHEETS v. TWENTIETH CENTURY FOX FILM CORPORATION.

#### No. 64876.

District Court of the United States for the District of Columbia.

June 4, 1940.

H. L. McCormick and Edward R. Walton, Jr., both of Washington, D. C., for plaintiff.

William B. Wolf, Simon Fleishman, and Fulton Brylawski, all of Washington, D. C., for defendant.

MORRIS, District Judge.

The defendant is a motion picture producer and came into existence by a merger between the Fox Film Corporation and Twentieth Century Pictures, Inc., which occurred in July, 1935; so, for convenience, the term "defendant" will be used to designate the Twentieth Century Fox Film Corporation subsequent to July, 1935, and its predecessor, Fox Film Corporation, prior thereto. The defendant produced in 1936 a motion picture entitled "The Road to Glory;" the filming of this picture was completed in March and it was first exhibited to the public in the late summer of that year. Between the time the filming was completed and its first public exhibition, considerable publicity was given to the forthcoming picture, and there appeared in the July issue of a magazine known as "The Silver Screen," published on June 5, 1936, an article giving the story of the picture in a condensed form, slightly modified to emphasize its romantic element, which was thought to have a greater appeal to the readers of that particular magazine than would its war features.

This proceeding is brought by the plaintiff, in which he seeks an injunction, an accounting and other equitable relief, alleging that he, in the month of January, 1935, composed, wrote and submitted to the defendant, for acceptance or rejection, an original scenario entitled "The Road to Glory," which the defendant rejected, but thereafter did make unauthorized use of the scenes, dialogue and other material composed by the plaintiff in the production and exhibition of its motion picture. Attached to the complaint, as Exhibit "B," is a statement of many similarities between the manuscript alleged to have been submitted by the plaintiff and the motion picture produced by the defendant. As shown by this statement, there are many instances in which the dialogue is not only similar, but identical, and this in such unusual phrases and expressions as do not admit of any accidental coincidence.

In the hearing of this cause it was deemed important by both parties that the motion picture should be exhibited to the Court, and this was done. Such exhibition revealed various differences in names of characters, dialogue and incidental action between the motion picture and the article giving the story of the picture, which appeared in the Silver Screen Magazine, and there is much closer identity in dialogue between plaintiff's manuscript and the Silver Screen article than between plaintiff's manuscript and the motion picture itself. It is quite apparent, however, that, if the plaintiff's manuscript was made use of as the basic source material for the Silver Screen article, it was because it had been made use of in the production of the

motion picture. It is nevertheless quite apparent that the statement of similarities attached to the complaint was the result of a comparison of plaintiff's manuscript with the Silver Screen article rather than the motion picture itself.

Prior to January, 1935, the plaintiff had written numerous stories and at least one motion picture scenario. While none of these stories or the scenario, entitled "Jeanne," were accepted or published, there had been newspaper announcement in the Jackson (Tennessee) Sun in October, 1934, to the effect that plaintiff had received a thousand dollar prize award for a scenario entitled "Anne of Westmar Square," submitted to Warner Brothers, motion picture producers. Although the plaintiff explained in his testimony that the newspaper article was in error; that he had never completed the scenario entitled "Anne of Westmar Square;" that he had not received any award or compensation from Warner Brothers, or any other motion picture producer; and that he was not responsible for the article being written, nevertheless this newspaper article did give to him some reputation as a young writer in his home community. The plaintiff submitted to several motion picture producers and to a marketing agency, called "The Universal Scenario Company," in Hollywood, California, the scenario entitled "Jeanne." The Universal Scenario Company wrote to the plaintiff on November 9, 1934, advising him that this scenario was considered by its reading committee to be suitable material for submission to studios and producers in Hollywood, and that the agency would publish a synopsis of the story in their scenario bulletin review for submission to motion picture producers and would act as agent in the marketing of the story upon the receipt of the sum of $25. The plaintiff did not make this remittance, notwithstanding the receipt of numerous other letters urging him to do so. The plaintiff testified that his scenario "Jeanne" was written by him at the request of Mrs. John Muse, of Jackson, Tennessee, who had written on the story herself, but, as she did not know anything about scenario writing, desired him to see what he could do to make a better story out of it, and that he thereupon rewrote the whole story. This undoubtedly accounts for such difference in the style of writing, between the first three acts and last two of that scenario,

that it is quite obvious. The relevance of this scenario "Jeanne" to the present controversy will be discussed at another point in this opinion.

There is no doubt that the plaintiff did write a dramatic composition entitled "The Road to Glory" in January, 1935. This was not only written by the plaintiff, but was produced as a stage play in Jackson, Tennessee, on February 15, 1935, at the Jackson High School, under the auspices of the American Legion, and a subsequent performance within the next few days was given in Bell, Tennessee. This play was directed by Mrs. L. C. Merwin, and among those taking part in the performance of the play were William Miller, Charles Miller, Winifred Deshazo and Roy Hardcastle, all of whom testified as witnesses in this case. There is nothing in common between this play, which, to avoid confusion, will be referred to as the Legion play, and the defendant's motion picture, except the name, which is identical, and the fact that, in certain scenes of each, one of the characters played upon a piano. There is no similarity or identity between the Legion play and the defendant's manuscript, alleged to have been submitted to the defendant, except the title, which is identical; that in certain scenes of each one of the characters plays upon a piano; and a passage occurring near the close of both plays, in which one of the characters in the former is made to say: "Little mother * * * Forgive me if I have caused you a single unhappy moment. Forgive me if my life has not been lived as you'd have had it lived. Darling * * * Isn't the road rugged * * * 'The Glory Road' * * * Its meant so much suffering for both of us, but see the greatness of its harvest." and in the latter, one of the characters is made to say: "Darling * * * Forgive me if I have caused you a single unhappy moment * * * forgive me if I have not lived as you would want me to live. Isn't the road rugged * * * the glory road * * * The price of glory is so great * * *."

The plaintiff insists that the story here in controversy was thought of by him over quite a period of time in the latter part of 1934, and that he made several longhand drafts which culminated in a final longhand draft, designated in this case as plaintiff's Exhibit No. 1. Plaintiff stated that he worked on this longhand draft and on the typewritten manu-

script, known in this case as plaintiff's Exhibit No. 2, in the early part of January, 1935, and that this work was done by him in the dormitory room of Charles and William Miller at Lambuth College in Jackson, Tennessee. His purpose was to produce the play, if he could secure a sponsor, but when he discussed the matter with Mrs. Merwin, whom he wished to direct the play, it was ascertained that it was not suitable for production as an amateur stage play; that he had thereupon written the so-called Legion play, which was completed at or about the time rehearsals began on February 1, 1935, of which a typewritten manuscript was also made. The importance of this Legion play in connection with this controversy will be discussed at another point in this opinion.

The plaintiff stated that he mailed the typewritten manuscript, plaintiff's Exhibit No. 2, which is the typewritten manuscript here in controversy, to the defendant on or about January 20th, and about that same time he sent a copy of this scenario to the Universal Scenario Company, the marketing agency which has already been mentioned.

The plaintiff's testimony as to the writing of the longhand manuscript, plaintiff's Exhibit No. 1, and the typewritten manuscript, plaintiff's Exhibit No. 2, is supported by the testimony of Charles Miller, William Miller, Winifred Deshazo and Roy Hardcastle, all of whom stated that, during the period in January, 1935, above referred to, they saw the plaintiff writing on the longhand manuscript and typing the typewritten manuscript in the Miller boys' room on an Underwood Typewriter, Model No. 5, which was owned by the Miller boys, and which is in evidence in this case, designated as defendant's Exhibit No. 12. The testimony of these witnesses with respect to the identity of the typewriter will be discussed more fully at another point in this opinion. The plaintiff's statement with respect to the time at which the story here in controversy was written is further supported by the testimony of Mrs. Merwin, who testified that she read the longhand manuscript and the typewritten manuscript in January of 1935. There is also testimony, by deposition, of Mrs. Florence Pearl Sheets, the plaintiff's mother, to the effect that she saw the typewritten manuscript in January, 1935, before it was mailed to the defendant. Testimony, by deposition, of Mrs. Lorelle H. Love was

to the effect that, during the summer of 1935, the plaintiff loaned to her a copy of the story here in controversy, which she read. The plaintiff also introduced in evidence a letter, dated February 7, 1935, received by him from the Universal Scenario Company, in which he is urged to sign an enclosed application and agreement, providing for the payment of $25 in such installments as might suit the plaintiff for the publication of a synopsis and other marketing service. The printed form of agreement attached to that letter has, in the space for the title of the manuscript, the typewritten words "The Road to Glory." The only other typewritten characters on the form are the figures "1250" to indicate the length of the synopsis to be published in the event the agreement should be signed. This is submitted by the plaintiff to corroborate his testimony that the story in controversy was in existence shortly after the time he stated that it was written by him, and that a copy of the story had been sent by him to the Universal Scenario Company. The plaintiff states that he did not execute the agreement nor make the remittance.

The plaintiff, in a deposition taken prior to the hearnig in this cause, stated that the typewritten manuscript was sent by him to the defendant by registered mail, but in his testimony taken at the final hearing, he stated this was an error, and that it had been sent by ordinary mail. An investigation at the Post Office in Jackson, Tennessee, disclosed no record of any registered mail from the plaintiff to the defendant. Plaintiff stated that the defendant returned the manuscript to him about three weeks after it had been sent, and that he received from the defendant a letter stating in substance: "Your manuscript 'The Road to Glory,' which we returned to you, is not suited to our present needs. However, we thank you for submitting it." This letter could not be produced by the plaintiff at the hearing in this cause. He stated that, sometime after conferring with his counsel, to whom he had showed the letter, it became lost because he attached no importance to it. Mrs. Florence Pearl Sheets, in her deposition, testified that she had seen the letter returning the manuscript, and stated that its contents were substantially as testified to by the plaintiff.

And, to definitely establish that the story in controversy was written in Jan-

uary of 1935, the plaintiff insists that he wrote Exhibit No. 2 in the Miller boys' room on the typewriter which is in evidence as defendant's Exhibit No. 12; that he has not had access to that typewriter since that time; and, therefore, that the typewritten manuscript could not have been written subsequent to the publication of the articles concerning defendant's motion picture, or subsequent to the public exhibition of the motion picture itself. It is not only uncontroverted that the typewritten manuscript was written upon the Miller boys' typewriter; it also has been shown by typewriting experts for both parties that this is unquestionably true.

The defendant, on its behalf, has introduced evidence to the effect that any unsolicited manuscript, which is received, is returned unopened, by registered mail, and that, when any manuscript, for any reason, is not so returned, a record is made of it, showing title, name of author, and certain data respecting the story; that this system was in effect in January, 1935, and for a long time prior and subsequent thereto; that no communication or manuscript was ever received by the defendant from the plaintiff; that the defendant did not have business dealings with the Universal Scenario Company, a manuscript marketing agency that has now ceased operations; and that it never received from that agency any manuscript or material composed by the plaintiff or any other person.

The defendant submitted evidence showing that the production of its motion picture "The Road to Glory" came about as a result of its purchase of a French film entitled "Les Croix de Bois" (Wooden Crosses). This French film had many war scenes, some made from actual combat during the World War of 1914–1918, and it was purchased so that the defendant could make use of such war scenes. Under the general direction of Darryl Zanuck, in charge of production for the defendant, an outline of a story, in which such war scenes would be used, was made by Stephen Morehouse Avery, which was little more than notes on suggested characters, and bears slight resemblance to the final script, from which the motion picture "The Road to Glory" was made. This bears date of September 7, 1935, and is in evidence as defendant's Beverly Hills Exhibit No. 12. Nunnally Johnson, associate producer, assigned Joel Sayre, a writer employed by the defendant, to the task of developing a story somewhat along the lines suggested by Mr. Avery's memorandum. Mr. Sayre's outline is in evidence as defendant's Beverly Hills Exhibit No. 1. Conferences were had with Mr. Zanuck, and the notes of these are in evidence. It was decided that the use of the battle scenes from the French picture required a more serious story treatment than the outlines so far afforded. William Faulkner was employed at the suggestion of Howard Hawks, the director, and with his collaboration a story outline was produced, which, with the suggestions and directions made by Mr. Zanuck, furnished the groundwork for the motion picture story later developed. This outline is in evidence as defendant's Beverly Hills Exhibit No. 2. Mr. Sayre and Mr. Faulkner together developed what was termed the "rough script," which is the first continuity containing full dialogue and directions for dramatic action. That is dated December 31, 1935, and is in evidence as defendant's Beverly Hills Exhibit No. 5. Notes of various conferences on this are in evidence, and the next full-length script, embodying, among others, some of the changes that had been suggested, bears date of January 14, 1936, and is in evidence as defendant's Beverly Hills Exhibit No. 7. The working title of these scripts is "Wooden Crosses." The final, or so-called "shooting script," is in evidence as defendant's Beverly Hills Exhibit No. 9, and in this script there appears certain blue pages, some of which are dated January 25, 1936, others dated January 29, 1936, and others dated February 3, 1936, which blue pages are obviously revisions made after the completion of the final script as originally written and inserted therein. There is testimony to the effect that certain of these blue page revisions were made by Walter Ferris, a writer engaged for that purpose, in which he received some suggestions from his wife, Mrs. Violet Kemble-Cooper Ferris. All of the persons who have been referred to as having performed services for the defendant in connection with this motion picture, performed such services in or near Hollywood, California. The evidence shows that an identical copy of the final script, with revisions, was sent by the defendant to the editor of the Silver Screen Magazine in New York City, who in turn furnished it to Jack Bechdolt, also in New York City, the author of the article ap-

pearing in the issue of the Silver Screen Magazine which has been referred to. The script furnished to Mr. Bechdolt is in evidence as defendants Beverly Hills Exhibit No. 23.

Evidently some changes were made in the actual filming of the motion picture, as the evidence does not disclose that any other script was made, but the viewing of the picture and the notes made during that exhibition revealed certain differences in names of characters, dialogue and minor action between the picture and the final script.

The witnesses, Darryl Zanuck, Nunnally Johnson, Stephen Morehouse Avery, Howard, Hawks, Walter Ferris and Mrs. Violet .Kemble-Cooper Ferris, all of whom testified by deposition, and Joel Sayre and William Faulkner, who testified in person at the hearing, positively denied having had any knowledge of the plaintiff or any manuscript written by him. Jack Bechdolt, the author of the Silver Screen article, also positively denied having had any knowledge of the plaintiff, or any manuscript written by him, and stated that, with the exception of certain original parts of the article, he had no material from which to write the article other than the final script with the revisions mentioned, which had been furnished to him through the office of the editor .of the Silver Screen Magazine.

The evolution of the title of the defendant's motion picture is explained by the use of the name "Wooden Crosses" on account of the French picture as a working title, the use of "Zero Hour" as a tentative title, and the choice of the final title "The Road to Glory" by reason of the fact that in 1926 Howard Hawks, the director of this picture, had directed a picture for the defendant which was released under the name of "The Road to Glory," which he thought was a good title, and one to which he considered the defendant had every right because of its previous use.

The evidence on behalf of the plaintiff and that on behalf of the defendant cannot be reconciled. Although many witnesses may have been honestly mistaken in their recollection as to certain material matters, the defendant has either knowingly made use of material submitted by the plaintiff, or the plaintiff has knowingly, in the writing of his manuscripts, made use of the Silver Screen article. It seems almost incredible that a person would think it pos-

sible to successfully commit a fraud by asserting that he had submitted a manuscript for a published motion picture if, in truth, he had not done so. It seems even more incredible that a number of witnesses would testify that they had seen a manuscript a year and a half before it actually was in existence, some of whom, at least, honestly believe their testimony to be correct. And, yet, I am convinced that is the case here.

In view of the preliminary statements of the plaintiff, it is not surprising that, without the knowledge of facts which only a long, critical and adversary trial of the cause has revealed, his counsel, who is of unquestioned integrity, reputable men (who, according to the evidence in the case, are furnishing funds with which to establish the claims of the plaintiff), and certain of his witnesses were fully convinced that the plaintiff had been defrauded by the defendant. I am convinced, however, as a result of this trial, which has consumed more than eight weeks with a record, depositions and exhibits of more than seven thousand typewritten pages, that those parts of the plaintiff's manuscript which are similar to, or identical with, the Silver Screen Magazine article were taken by the plaintiff from that article, and that he did not either write or type his manuscripts until after its publication. I am also convinced that many of the witnesses who testified that they saw or read plaintiff's Exhibits No. 1 and No. 2 in January, 1935, or at any other time prior to June 5, 1936, confused those manuscripts with the Legion play entitled "The Road to Glory," which was written by the plaintiff in January, 1935, and a stage performance of which was given in February, 1935. Their positive statements are to the contrary, but extensive examination has revealed a state of recollection that is in such marked contrast to the uniformity of comment concerning plaintiff's manuscripts in question, that one is forced to the conclusion, in the light of all of the evidence in the case, that their recollection has been sophisticated with suggestion.

It is conceded by both parties that, in plaintiff's manuscript and the Silver Screen article, written in connection with the defendant's motion picture, there are five scenes in which there is such substantial similarity or identity that no explanation is admissible other than that one was taken from the other. These five scenes.

which constitute the major part of both the plaintiff's manuscript and the Silver Screen article have been, for convenience, referred to as the "first cellar scene," the "hospital scene," the "second cellar scene," the "blind captain scene," and the "barrage scene." Undoubtedly plaintiff's longhand manuscript was written, even though it may not have been completed, before the corresponding parts of plaintiff's typewritten manuscript. It is not claimed that the longhand manuscript was ever submitted by the plaintiff to the defendant. It is claimed that the typewritten manuscript was so submitted. It is difficult to see how Mr. Bechdolt, the writer of the Silver Screen article (who secured his material through the editor of that magazine from the defendant), could have made use of any material appearing in plaintiff's longhand manuscript, which does not appear in plaintiff's typewritten manuscript, even assuming he had the latter, or material taken from it. If, therefore, the plaintiff's longhand manuscript contains matter which identifies it with the Silver Screen article in instances not disclosed by the typewritten manuscript, this circumstance strongly supports the testimony of the witnesses for the defendant; and, if the evidence offered by the defendant, supported by the internal evidence of these manuscripts, is accepted, the inference is inescapable that the plaintiff's longhand manuscript was taken from the Silver Screen article.

It would not be practicable, nor would it serve any proper purpose to undertake in this opinion to analyze every part of the evidence. A comparison of the longhand manuscript with the Silver Screen article discloses many instances where there are expressions in both which do not appear in plaintiff's typewritten manuscript. I shall undertake to point out, as illustrative, only several instances with respect to certain of the scenes above mentioned.

In the "first cellar scene," in the Silver Screen article, the character called "Monique" and the character called "Lieutenant Delaage" had met in a cellar during an air raid. On page 33, column 2, of the Silver Screen article, there occurs the following passage:

"Then she saw that escape was possible. Rain had begun, the raid was over with its coming. * * * He tried to warn her of the danger of bombs. 'How long have you been at the front, Lieutenant?'

'Two years, my child. I'm a veteran.' 'And you haven't learned yet that *when the rain comes, the planes go away?*'

"His smile was rueful. *'I was hoping you didn't know!* I can't understand it, but nothing I do seems to work—'" (Italics are supplied.)

On pages 12, 13 of plaintiff's longhand manuscript, in the corresponding scene, there occurs the following, in which the character corresponding to Lieutenant Delaage is called "Franz," and the character corresponding to Monique is called "Jeanne:"

"It was raining—Franz saw she was really leaving—He jumps up—

"Franz: 'Wait don't leave—we may have another raid.'

hope not
"Jeanne: 'I ~~hardly think so. You see it's raining~~

"Franz: ~~'Oh—I—see—you—knew'~~

"Franz: 'But—I can see you again can't I?'" (This entire manuscript is replete with words, sentences, and sometimes paragraphs stricken out and changes made by insertions. In the above passage the lines stricken out are so indicated.) On page 7 of plaintiff's typewritten manuscript, this passage reads as follows:

"It had begun to rain. Franz saw that she was really going. He jumps up * * *

"Franz: 'Wait * * * don't leave. We may have another raid.'

"Jeanne: 'I hope not * * *'

"Franz: 'But * * * I can see you again can't I?'"

It is obvious that the Silver Screen article, in so far as it expresses the thought that airplane raids do not take place while it is raining, and that the lieutenant in this scene discovers that Monique knew this fact, could not have been taken from plaintiff's typewritten manuscript. On the other hand, it is very clear, from the words which were written in plaintiff's longhand copy, but then stricken out, that the thought expressed in the Silver Screen article was at first set forth and then changed.

In the "hospital scene," as it is written in the Silver Screen article, Monique discovers that Lieutenant Delaage has made use of a subterfuge to gain admittance to the hospital to see her, that is, his arm is made to appear wounded, although it is not. On page 33, column 2, there

occurs the following exclamation by Monique: "'*As I thought!* Aren't you ashamed of such a stupid trick?'" The corresponding statement by Jeanne in plaintiff's longhand manuscript occurs on page 14 of that exhibit: "'*As I thought.* Aren't you ashamed to pull such a stupid trick?'" The expression is altered in plaintiff's typewritten manuscript, where it occurs on page 8 of that exhibit: "'*I might have guessed it.* Aren't you ashamed to pull such a stupid trick?'" It might be here noted that similar dialogue and action do not occur in defendant's motion picture, although appearing in the final script from which it was made, and from which the Silver Screen article was written.

In the "second cellar scene," there is some difference in the minor action between the Silver Screen article and both of plaintiff's manuscripts in that, in the former, the characters Monique and Lieutenant Delaage enter the cellar together, while the plaintiff, in both of his manuscripts, has Franz in the cellar, playing on a piano, when Jeanne slips in, hides herself, and subsequently attracts his attention. The significance of this will be found in a comparison of that passage, which occurs in the Silver Screen article on page 70, with that which occurs in plaintiff's longhand manuscript on page 17. The former reads as follows: "'But we'll come again, won't we?' Delaage urged. 'I had such a strange, warm feeling—when he came in here together—as though *we were* coming home, didn't you?'" The latter reads as follows: "Franz: 'I am so glad you came—Jeanne—~~it—.~~ I had such a strange warm feeling—when you came in—it seemed as though you ~~we were~~ were coming home.'" This passage in plaintiff's longhand manuscript was carried forward in his typewritten manuscript, which reads as follows: "Franz: 'I am so glad you came Jeanne. * * * Somehow, I had such a strange feeling when you came in. It seemed as though *you were* coming home. * * *'" In view of the fact that the plaintiff had his characters come into this scene separately, and not together, as was the case in the Silver Screen article, the use of the words *"we were* coming home" admits of but one inference as to which writing was taken from the other.

In the "blind captain scene" there are many instances of the type now being considered. On page 72 of the Silver Screen article a passage appears which is strikingly significant. The character called "Captain Marache," who has been blinded in action, enters the scene where Lieutenant Delaage and Monique are together. They see him but do not know that he has been blinded. *"Monique moved out of her lover's arms.* That still, *expressionless* mask whose eyes never turned from her, beckoned her on." In the comparable scene in plaintiff's longhand manuscript, on page 23, that action is described, Captain Paul Deggart being the character corresponding to Captain Marache, as follows: "Just then Deggart enters—~~she moved out of her lover's arms~~—feeling bandaged his way, his face pale, arms ~~bleeding~~ and uniform torn to bits. He stops—[Mo] Jeanne *moves out of Franz's arms—face expressionless,*—she walks up to Daggart." This is carried forward in plaintiff's typewritten manuscript, on page 11, as follows: "* * * *Jeanne moves out of Franz's arms* * * * *face expressionless,* she walks up to Paul. * * *" Aside from the identical phrase "moved out of her lover's arms" occurring in both the Silver Screen article and the plaintiff's longhand manuscript, the plaintiff used the term "face expressionless" as applying to the character Jeanne (On page 24 of the plaintiff's longhand manuscript, there occurs the phrase "Jeanne's expressionless eyes."), whereas, in the Silver Screen article, the term "expressionless" is understandably applied to the captain whose eyes are sightless. Also, with respect to this passage, there occurs one of the very few instances where an eraser was used on plaintiff's longhand manuscript. He at first testified that all of the changes made by him were by striking through and insertions. When this passage and three others were called to his attention, he stated that he had been in error in so testifying. Here the Silver Screen article, as stated above, contains the expression "Monique moved out of her lover's arms." In plaintiff's longhand manuscript, after the words "he stops * *," there was first written the letters "Mo," which were then erased, leaving them only slightly discernible, and over this erasure is written the first letters of the word "Jeanne" in the sentence "Jeanne moves out of Franz's arms." The plaintiff explained that, in all probability, he had

intended to write the word "moves," and not the word "Monique" which occurs in the Silver Screen article at that identical point. Plaintiff failed, however, to explain why it was desirable to undertake to obliterate this inadvertence by erasure instead of the method of striking through, which he elsewhere so generously employed throughout his manuscript. The inadvertent use of the word "Monique," in plaintiff's longhand manuscript, would have left little ground upon which the plaintiff could have claimed original authorship.

In the "barrage scene," again the action is somewhat different between the plaintiff's manuscripts and the Silver Screen article. The plaintiff has the lieutenant, Franz, helping the blind captain, Paul Daggart, to reach the advance position and they together direct a barrage from a field telephone. In the Silver Screen version, the blind captain, Paul Marache, is accompanied and assisted by his father, "Private Morain;" he having ordered, the Lieutenant, Delaage, in the "blind captain scene," to take charge of the company. With this difference in action in mind, a comparison of the following passages is revealing. On page 73 of the Silver Screen article, there appears: "The blind eyes turned toward Delaage. 'Lieutenant, *report* to the company as commander—' 'But Captain, I think—' His voice went sharp. 'Have I asked you what you think?' Delaage saluted. His eyes turned to Monique but she did not see him. She was pressed besides Marache's chair, weeping." In the plaintiff's longhand manuscript, on page 26, at the corresponding point of the action in the "blind captain scene," there is the following:

"Franz:—'But  Captain—I  think—'
                                             to
"Paul: 'Have I asked you ~~what~~ you/
                     . is
think?'—[*report*] Jeanne ~~was~~ by his chair weeping—".

And this is carried forward in plaintiff's typewritten manuscript in the following lines on page 12:

"Franz: 'But Cap  *  *  *  I think. * * *'
"Paul: 'Have I asked you to think * * * ?' Jeanne is beside his chair crying. * * *"

The word "report," which appears in the Silver Screen article was also written, as above indicated, in plaintiff's longhand

manuscript. The use of the word here is thoroughly inconsistent with the action in the plaintiff's story, and it is not carried into plaintiff's typewritten manuscript. It is, therefore, strikingly significant that this word was not merely stricken through, as happened in so many instances in plaintiff's longhand manuscript, but an attempt was made to obliterate it by the use of an eraser, which left it only slightly discernible.

In an entirely different category from those instances which have been discussed are two passages, which are common to the Silver Screen article and both of plaintiff's manuscripts, but which find no source whatever in the material furnished by the defendant to Mr. Bechdolt, the author of the Silver Screen article. On page 32 of the Silver Screen article there appears the first of these passages, which is said by the character Monique: " 'Goodbye! Goodbye Paul * * * God guard you and bring you back safe from the trenches.' " In plaintiff's longhand manuscript, on page 3, is the following, said by the mother of Paul Daggart: "Ma Daggart: 'Goodbye! Goodbye Paul * * *
                                  safe
God guard you and bring you back ~~to me~~ from the trenches.' " This is carried forward in plaintiff's typewritten manuscript, on page 2, as follows: " 'Goodbye! Goodbye Paul * * * God guard you and bring you back safe from the trenches. * * *' " And the second of the passages referred to are the last lines of the Silver Screen article, on page 74: "*She was the light that went before, leading his weary feet along the road to glory.*" The last lines of the plaintiff's longhand manuscript, on page 38, are the following:
                          is
"Jeanne ~~was~~ the light that ~~led * * *~~
goes
~~went~~ before, leading his feet along the road to glory." And this passage is carried forward as the closing lines in plaintiff's typewritten manuscript as follows, on page 16: "*Jeanne is the light that goes before, leading his weary feet along the road to glory.*" It is the testimony of Mr. Bechdolt that both of the passages last referred to were composed by him to give to his article more romantic interest, as he had been directed to do by the editor of the magazine for which he was writing. Neither these passages, nor any having similarity to them, are contained

in the final script furnished to him by the defendant, nor do they appear in the defendant's motion picture.

The plaintiff urges, in explanation of the instances where there are differences between his longhand manuscript and his typewritten manuscript and yet similarities in those instances between his longhand manuscript and the Silver Screen article, that immediately before the writing of the typewritten manuscript in evidence as plaintiff's Exhibit No. 2, and which he claims was submitted to the defendant, he prepared another typewritten manuscript, which probably followed his longhand manuscript as to words and expressions which were subsequently stricken out by him; that this first typewritten manuscript was sent by him to the Universal Scenario Company, and that it must have found its way to the defendant, and that the defendant in turn must have transmitted it, or material containing passages from it, to Mr. Bechdolt, the author of the Silver Screen article.

In the first place, there is no evidence from which an inference could reasonably be made that the defendant had access to any manuscript furnished by the plaintiff to the Universal Scenario Company, and, even if such an inference could be made, it would be preposterous to assume that the defendant, in California, would furnish to the Silver Screen Magazine, in New York City, and to Mr. Bechdolt, in that city, not only a full length script from which to prepare an article on its forthcoming motion picture, but *in addition* a manuscript, or other material, which defendant had no right to use, and which it had wrongfully made use of in the preparation of the full length script. In the second place, the evidence as to the submission by the plaintiff to the Universal Scenario Company of a manuscript entitled "The Road to Glory" is too dubious to establish that as a fact. Reference has already been made to the printed form, attached to a letter, dated February 7, 1935, received by the plaintiff from the Universal Scenario Company, in the manuscript title space of which were the typewritten words "The Road to Glory." Expert witnesses for both the plaintiff and the defendant agree that an erasure has been made on this printed form at that place over which "The Road to Glory" was typewritten. They also agree that the figures "1250," appearing on that form

were typewritten over an erasure. They were not able to state what word or figures had been erased, but the erasure over which the words "The Road to Glory" were written was substantially less than the space required for the writing of those words. In these circumstances, it is strikingly significant that, in other correspondence between the plaintiff and the Universal Scenario Company there does not occur a single letter or form referring to "The Road to Glory." All of such correspondence has reference to the scenario entitled "Jeanne," submitted by the plaintiff to the Universal Scenario Company prior to November 9, 1934. Although such correspondence, written at somewhat regular periods, urges the plaintiff to make remittance of its fee for handling that scenario, there does not appear a form with reference to "Jeanne" such as that upon which there is an erasure over which is written the words "The Road to Glory." The letters written with reference to "Jeanne" and the dates thereof, with respect to the time that scenario was submitted, would, furthermore, make it appear most unreasonable that a letter and form such as above referred to would be sent from Hollywood, California, on February 7, 1935, with respect to a manuscript mailed at Jackson, Tennessee, on or about January 20, 1935, which is the time plaintiff states he sent "The Road to Glory" to the Universal Scenario Company. I, therefore, cannot give to this evidence the weight which plaintiff insists it should have.

It is insisted on behalf of the plaintiff that there are numerous instances of similarity between passages in his typewritten manuscript and defendant's preliminary scripts, which do not appear in defendant's final script or the Silver Screen article. A close examination and analysis of each of the instances of such similarities reveal that there is not such identity of language or of action as would support an inference that the plaintiff's manuscript was made use of in the writing of defendant's preliminary scripts.

It is also urged on behalf of the plaintiff that the testimony of the several witnesses employed by the defendant for the preparation of the preliminary and final scripts, used in the production of its motion picture, is in such conflict as to which of them wrote the disputed passages and scenes that no weight can properly

be given to their testimony. It would require a length to which this opinion should not go to set forth the testimony of these witnesses as to which this contention is made. It will have to suffice to say that such testimony shows that the preliminary scripts, and indeed the final one, were the result of such collaboration and revision that it is natural and reasonable that there should be uncertainty as to exactly what part each witness had in the making of each passage or scene, to the writing of which several contributed. Indeed, in these circumstances, it would excite a reasonable suspicion if, after a long lapse of time, there should be a unanimity of recollection in this respect.

As previously stated, it is established that plaintiff's typewritten exhibit was typed on an Underwood, Model 5, typewriter, owned by Charles Miller and William Miller, which is in evidence as defendant's Exhibit No. 12. The testimony of the plaintiff is that he did not own a typewriter during the month of January, 1935, and that it was during that period that he made use of the Miller boys' typewriter in their room at Lambuth College. The plaintiff was a resident of Jackson, Tennessee, not attending, but residing near, the college. It was subsequently shown during the hearing, by the records of the International Typewriter Exchange, in Chicago, Illinois, that the plaintiff purchased a typewriter from that company prior to January, 1935, and that such typewriter was returned to that company by the plaintiff subsequent to January, 1935, whereupon the plaintiff stated that his previous testimony was in error. William Miller, in a statement made prior to the taking of his testimony, stated that he was not certain that he and his brother had a typewriter during the school year 1934–35. He was, however, certain that plaintiff did typing in his room during January of 1935, prior to the time rehearsals of the Legion play commenced on February 1st. At the time of making such statement he was certain that the plaintiff did such typing on either the typewriter owned by his brother and himself, if they had the typewriter at that time, or on a typewriter which the plaintiff brought to their room. William Miller, in his testimony, stated that he had made inquiry of his father, who gave the typewriter to him and his brother, and learned that the typewriter was given to them prior

to the opening of college in the fall of 1934, and his father, C. C. Miller, also testified to that effect. William Miller, therefore, testified that it was their typewriter which had been used by the plaintiff in January, 1935.

Charles Miller stated that he had no doubt that he and his brother had their typewriter in January, 1935, and that the plaintiff used it at that time in the typing done by him in their room. Both of the Miller boys stated that subsequent to January, 1935, plaintiff did not visit their room as he had theretofore, and that he did no typing on their typewriter. They both testified that the door of their room was kept locked when they were absent. They further stated that the typewriter was carried with them to their home, in Dexter, Missouri, at the close of college about the first of June of 1935; and that they brought it back with them at the beginning of the school term in the fall of 1935. The testimony shows that they returned home about the last of May, or first of June, in 1936, but the evidence also shows that they returned to the college in June, 1936, and remained there, occupying their room for the greater part of that month, when they then again went home, taking with them everything which belonged to them and which had not been previously taken, and they did not again attend that college. There is evidence to the effect that they carried the typewriter with them on their first trip home, about June 1, 1936, but very minute cross examination disclosed that the testimony on this point is not entirely reliable.

The history of this typewriter is of great importance in the disposition of this case. The evidence shows that, as a rebuilt machine, it was acquired by Reverend Frank Stickney, who lived in Grandin, Missouri, from Montgomery Ward & Company in October or November of 1932. He gave the typewriter to his daughter, for whom he purchased it, and who did certain typing for him. Some of this typewritten matter is in evidence as defendant's Exhibit No. 22, and the expert testimony is that it was written on the same typewriter upon which was typed plaintiff's typewritten manuscript, that is, the typewriter in evidence as defendant's Exhibit No. 12. Sometime before Christmas, 1934, Mr. Stickney's daughter gave the typewriter to her brother, Virgil Stickney. The testimony of Virgil Stickney is that

the typewriter was taken to the home of Reverend F. M. Fowler, his wife's grandfather, in Dexter, Missouri, in January, 1935; that it remained there until sometime between August and November of 1935, when he traded the typewriter to the C. C. Miller Motor Company in Dexter, Missouri, for a 1923 model Buick automobile. He testified that Mr. C. C. Miller stated that he would accept the typewriter in such trade if it was found to be satisfactory to his sons, Charles Miller and William Miller, to whom he intended to give it; that the typewriter was found to be satisfactory; and the trade was made. There is substantial conflict in the testimony of the other witnesses respecting the date this typewriter was traded for the automobile, and Virgil Stickney's testimony would not alone be sufficient to establish a fact so critical to this case as that date. He is, however, corroborated not only by a number of witnesses who had apparently clear recollection, but he is also corroborated by facts which are established beyond question. The title to the 1923 model Buick automobile was taken by Virgil Stickney in the name of his wife, Ruth Stickney. The registration for the title of that automobile was accomplished on October 22, 1935, as shown by certificate of the Secretary of State of the State of Missouri, filed in evidence as defendant's Exhibit No. 17, and a prior owner of that automobile is shown by that exhibit to have been R. H. Seeburger, Dexter, Missouri. The testimony of Richard H. Seeburger is that he purchased a 1935 model Plymouth automobile from C. C. Miller Motor Company in July, 1935, and a chattel mortgage, filed in evidence as defendant's Exhibit No. 36, describing such automobile, is dated July 18, 1935. Mr. Seeburger further testified that he turned in the 1923 model Buick automobile to the C. C. Miller Company in part payment of the Plymouth automobile purchased by him. Mr. Seeburger's testimony is further corroborated by the testimony of Lionel Kaplan, an authorized dealer in Plymouth automobiles, who stated that no new Plymouth automobile of the model purchased by Mr. Seeburger could have been sold to the public prior to December, 1934, at which time that model was first announced and put on the market. He further testified that, taking into consideration the motor number and the serial number of the car sold by the C. C. Miller

Motor Company to Mr. Seeburger, it was his opinion that such car could not have been offered for sale prior to March or April, 1935.

While the evidence shows that Virgil Stickney had other transactions with the C. C. Miller Motor Company, it is clear that the trade whereby Mr. C. C. Miller acquired the typewriter was in connection with the 1923 model Buick automobile. It is of significance also that, of the letters written on the typewriter by Charles Miller to his parents, which were produced at the hearing, all were written subsequent to the opening of the school year, 1935–36, and among these letters was one written in the fall of 1935, and filed in evidence as defendant's Exhibit No. 13, in which there appears the following: "The typewriter is handy, Dad, and it works real well. We put a new ribbon in it." This expression would certainly have a more reasonable application to the typewriter if it had been but recently acquired then if it had been acquired a year previously.

Taking into consideration all of the evidence on this question, its weight overwhelmingly supports the conclusion that the plaintiff could not have had access to the typewriter owned by Charles and William Miller prior to the fall of 1935, and that he did have access to it from that time until the latter part of June, 1936; or, stated differently, that the plaintiff did not have access to the typewriter in January, 1935, at which time he claims that he made his typewritten manuscript on such typewriter, and that he did have access to it subsequent to the publication of the Silver Screen article. This conclusion is reinforced by the internal evidence of the plaintiff's manuscripts and the Silver Screen article previously discussed.

It is urged on behalf of the plaintiff that there was not sufficient time within which he could have written his longhand manuscript and his typewritten manuscript between the time of the publication of the Silver Screen article on June 5, 1936, and the time when those documents were exhibited by him to Mr. C. E. Pigford, which time is not definitely fixed by Mr. Pigford's deposition, but which appears to have been prior to July, 1936. The longhand manuscript consists of thirty-eight sheets of paper, a number of the pages of which are only partly filled with writing, and many of them are partly

filled with matter which has been stricken out. The typewritten manuscript consists of sixteen letter-size pages, and none of them are solidly filled with writing. The major part of both manuscripts is devoted to the five scenes taken from the Silver Screen article. With the plaintiff's experience in writing and typing, disclosed by his other compositions, it is not improbable that he could have written his longhand manuscript, which has every appearance of being hurriedly written, and typed his typewritten manuscript in a matter of days rather than weeks.

In view of the foregoing (and much evidence which it has not been thought practicable or necessary to discuss in this opinion), I make the following findings of fact and conclusions of law:

### Findings of Fact.

1. That the defendant did not make use of any composition, manuscript, or other writing of the plaintiff, or any ideas, dialogue or description therefrom in the writing, composition or preparation of the motion picture produced by the defendant under the name of "The Road to Glory," or in any of the scenarios, scripts, memoranda or other written material, from which said motion picture was produced, or in any publicity material or written description of said motion picture issued or published in connection therewith.

2. That the plaintiff did not submit to the defendant the typewritten manuscript entitled "The Road to Glory," in evidence as plaintiff's Exhibit No. 2, for acceptance or rejection by the defendant, as alleged in the Bill of Complaint.

3. That the plaintiff did not write or compose the scenario entitled "The Road to Glory," in evidence as plaintiff's Exhibit No. 2, nor the longhand manuscript, in evidence as plaintiff's Exhibit No. 1, from which the typewritten manuscript above referred to was made, until after the publication in June of 1936 of the periodical known as the "Silver Screen," a copy of which is in evidence as defendant's Exhibit No. 7, and which periodical contained a story or article concerning and purporting to give excerpts from the motion picture subsequently produced by the defendant under the name of "The Road to Glory."

4. That the plaintiff, in the writing and composition of the longhand manuscript, in evidence as plaintiff's Exhibit No. 1, made use of and, in many instances, exactly copied portions of the said article appearing in the periodical known as the "Silver Screen."

5. That the typewritten scenario written by the plaintiff, entitled "The Road to Glory," in evidence as plaintiff's Exhibit No. 2, was written upon the typewriter in evidence as defendant's Exhibit No. 12, to which typewriter the plaintiff did not have access until the beginning of the school year 1935–1936, and to which he did have access until the latter part of June, 1936, and subsequent to the publication of the periodical above referred to as the "Silver Screen," in evidence as defendant's Exhibit No. 7.

6. That the typewriter, in evidence as defendant's Exhibit No. 12, was acquired by the C. C. Miller Motor Company in a trade from Virgil Stickney subsequent to the close of the school year 1934–1935 and subsequent to the time at which the plaintiff alleges that the typewritten manuscript, in evidence as plaintiff's Exhibit No. 2, was written by the plaintiff on said typewriter.

### Conclusions of Law.

From the findings of fact herein-above set forth, the conclusion of law is that the plaintiff is not entitled to the relief prayed for in the Bill of Complaint, and that the bill should be and is hereby dismissed, with the costs of these proceedings to be taxed upon the plaintiff.